Donald M. Falk (Cal. Bar No. 150256)
SCHAERR | JAFFE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

H. Christopher Bartolomucci (D.C. Bar No. 453423)*
Brian J. Field (D.C. Bar No. 985577)*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
bfield@schaerr-jaffe.com

*Pro hac vice application forthcoming

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL ABATTI, THE MICHAEL AND KERRI ABATTI FAMILY TRUST, and MIKE ABATTI FARMS, LLC,

　　　　　　　　*Plaintiffs*,

v.

IMPERIAL IRRIGATION DISTRICT, ALEX CARDENAS, NORMA SIERRA GALINDO, JAVIER GONZALEZ, J.B. HAMBY, and JAMES C. HANKS, in their official capacities as members of the Board of Directors,

　　　　　　　　*Defendants*.

Case No.: **'22 CV 1323 MMA KSC**

**COMPLAINT**

Plaintiffs Michael Abatti, The Michael and Kerri Abatti Family Trust, and Mike Abatti Farms, LLC, allege as follows:

## I.    INTRODUCTION

1.    This is a civil action brought by Plaintiffs against Defendants Imperial Irrigation District ("the District") and the individual members of the District's Board of Directors.

2.    Michael Abatti ("Mr. Abatti") and his family are farmers and landowners in California's Imperial Valley. The Abatti family has been farming in the Valley for more than a century. Mr. Abatti himself has been doing so for more than 40 years.

3.    Like all farmers in the Imperial Valley, Mr. Abatti uses water from the Colorado River to irrigate his farmland. Based on his longstanding beneficial use of Colorado River water, Mr. Abatti possesses water rights recognized under federal law. These water rights spring from and are measured by his beneficial use of Colorado River water and are appurtenant to his land.

4.    For decades, the District wholeheartedly agreed that Imperial Valley farmers have water rights. In briefing submitted in *Bryant v. Yellen*, 447 U.S. 352 (1980), the District advised the Supreme Court that the farmers it serves—like Mr. Abatti—own water rights, and it expressly disclaimed ownership of those rights. The District told the Supreme Court: "the District is merely the trustee of water rights for the landowners, who are the beneficial owners, and their beneficial interest is a constitutionally protected property right which is appurtenant to the land irrigated." Br. of Pet'r Imperial Irrigation Dist. at 33, *Bryant v. Yellen*, 447 U.S. 352 (1980) (No. 79-435), 1980 WL 672720, at *19 (*Bryant* Pet'r Br.).

5.    Subsequent to *Bryant*, however, the District has reversed course, now claiming that Imperial Valley farmers—like Mr. Abatti—possess *no* water rights at all. Rather, under the District's new view, Mr. Abatti and other farmers merely receive a water service from the District, a service that the District has complete discretion to change at any time.

6.     Operating under this new view, in 2013, the District for the first time adopted a permanent water allocation scheme, which it called an Equitable Distribution Plan ("the 2013 EDP"). But there was nothing equitable about it. Had it gone into effect, the 2013 EDP would have flagrantly violated Mr. Abatti's water rights.

7.     Thus, Mr. Abatti and Mike Abatti Farms, LLC challenged the 2013 EDP in state court in California. The Superior Court struck down the 2013 EDP, ruling that the District abused its discretion in adopting it. The Superior Court also found that the 2013 EDP was not equitable because it disadvantaged farmers compared to other water users. The Court of Appeal affirmed that decision on narrow state law grounds.

8.     Nearly a decade later, the District is at it again. On June 21, 2022, the District adopted a new EDP ("the 2022 EDP" or "EDP"). This EDP again violates Mr. Abatti's federal water rights and the Fifth and Fourteenth Amendments to the Constitution. It is also contrary to the Supreme Court's decision in *Bryant* and the District's binding representations in that case.

9.     Accordingly, the Court should grant the relief requested in this Complaint, and prohibit the District from enforcing the 2022 EDP.

## II.     PARTIES

10.    Plaintiff Michael Abatti owns and farms land in Imperial County, California. He and his businesses irrigate farmland using Colorado River water.

11.    Plaintiff The Michael and Kerri Abatti Family Trust owns land in Imperial County that is farmed by Mr. Abatti and Mike Abatti Farms, LLC. Mr. Abatti is its trustee.

12.    Plaintiff Mike Abatti Farms, LLC is a company in the farming business organized under the laws of the State of California. Mr. Abatti is the Chief Executive Officer and a manager of Mike Abatti Farms, LLC.

13.    Defendant Imperial Irrigation District is an irrigation district under California law. An irrigation district is a public corporation governed by a board of directors and empowered to distribute and otherwise administer water for the beneficial use of its inhabitants. The District is an agency of the government of California. *See* Cal. Water

Code § 20570 ("It is reaffirmed that districts are state agencies formed and existing for governmental purposes.").

14. Defendants Alex Cardenas, Norma Sierra Galindo, Javier Gonzalez, J.B. Hamby, and James C. Hanks (collectively, "the Individual Defendants") are members of the District's Board of Directors. Defendant Hanks is the Board's president. Each of the Individual Defendants participated in enacting the 2022 EDP and is sued in his or her official capacity as a member of the Board.

## III. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Plaintiffs' civil action against Defendants is one "arising under the Constitution, laws, or treaties of the United States." *Id*. The federal questions presented by this case include whether Defendants have violated Plaintiffs' federal water rights.

16. Venue is proper in this judicial district under 28 U.S.C. § 1391(b). All Defendants are California residents, and some or all of them, including the District, reside in this judicial district. *Id*. § 1391(b)(1). Furthermore, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, and a substantial part of the property that is the subject of this action is situated, in this judicial district. *Id*. § 1391(b)(2).

## IV. FACTUAL ALLEGATIONS

### A. Mr. Abatti and Farming in the Imperial Valley

17. There are hundreds of farms located in the Imperial Valley. *See* Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., [2017] 1 Census of Agriculture, California 246 tbl.1 (Apr. 2019) (identifying 396 farms in Imperial Valley). And Imperial Valley agriculture is essential to the nation's food supply. "About two-thirds of the vegetables eaten nationwide during winter are grown in Imperial County." Robin Meadows, *Research News: UC Desert Research and Extension Center Celebrates 100 Years*, 66 Cal. Agric. 122, 122 (2012).

18.     Farming has a long history in the Imperial Valley.  Indeed, Mr. Abatti's family has been farming in Imperial Valley for more than 100 years.  And Mr. Abatti has been farming in the Imperial Valley for more than 40 years.

19.     Mr. Abatti's ancestors were among those who settled the Imperial Valley more than a century ago.  Mr. Abatti's grandfather, Battista Abatti, helped build the All-American Canal, which brings to the Valley the Colorado River water that makes possible the Valley's thriving farming community.  Battista Abatti's sons, Ben Abatti and Tony Abatti, started farming businesses in the Valley.

20.     Mr. Abatti followed in their footsteps.  Today, Mr. Abatti and his farming business own or lease and irrigate and farm approximately 7,000 acres of farmland.

21.     Mr. Abatti's farming business grows a variety of crops, including grains, alfalfa, Kleingrass, Bermuda grass, Sudan, alfalfa seed, Bermuda seed, broccoli, broccoli seed, vegetables, sugar beets, and melons.

22.     A significant portion of the acreage that Mr. Abatti farms has sandy, or light, soil, which requires more water to farm than the land in the Valley with denser soils.

23.     Indeed, the Imperial Valley "is an arid desert in its natural state." *Bryant*, 447 U.S. at 356.

24.     Thus, Mr. Abatti, like all farmers in Imperial Valley, is entirely dependent upon the Colorado River for irrigation.

25.     For that reason, in 1896, the California Development Corporation ("CDC") formed to facilitate the irrigation of desert lands in the Valley using Colorado River water.  CDC first diverted water from the River in 1901, and formed several mutual water companies to facilitate distribution of that water.

26.     Then, in 1911, Imperial Valley farmers formed the District to acquire CDC's assets, including its water rights.

27.     In 1916, the District assumed the distribution of Colorado River water to the mutual water companies.  And, by 1923, the District had acquired all of the mutual water companies and was delivering water directly to farmers.

28.     The District is now responsible "for the diversion, transportation, and distribution of water from the Colorado River to the Imperial Valley." *Id.* at 357 n.3. And the District delivers water from the Colorado River to water users in the Valley pursuant and subject to federal law, including Section 8 of the Reclamation Act, 43 U.S.C. § 372.

29.     Today, California's Colorado River water users have a basic annual entitlement to 4.4 million acre-feet. Of this, Imperial Valley water users have a basic annual entitlement to 3.1 million acre-feet. *See* Colorado River Water Delivery Agreement—Implementation Agreement, Inadvertent Overrun and Payback Policy, and Related Federal Actions, Colorado River, Arizona, California and Nevada ("Federal Quantification Settlement Agreement,"), 69 Fed. Reg. 12,201 (Mar. 15, 2004).

30.     This provides irrigation to nearly 500,000 acres of farmland within the District. Of this, approximately 96% of the water the District supplies is used for agricultural users. *See* IID, Service Area Plan 2020 (Oct. 2020).

**B.     Federal Laws Governing the Use of Colorado River Water**

31.     As noted above, irrigation in the Imperial Valley began in 1901, "using water diverted from the Colorado River." *Bryant*, 447 U.S. at 356. As time went on, however, it became clear that "[t]he natural flow of the Colorado was too erratic … and the engineering and economic hurdles too great for small farmers, larger groups, or even States" to build the infrastructure necessary to reclaim all surrounding arid lands. *Arizona v. California*, 373 U.S. 546, 553 (1963). "[T]he job was so big that only the Federal Government could do it." *Id.* at 554.

32.     In 1928, therefore, Congress enacted the Boulder Canyon Project Act ("Project Act"), 43 U.S.C. § 617 *et seq*., which implemented and ratified the Colorado River Compact signed in 1922 by seven states located in the Colorado River Basin.

33.     The Project Act allocated water among several of these states and authorized the construction of the Hoover Dam and other works along the river. *Bryant*, 447 U.S. at 357–58.

34.    It also authorized the Secretary of the Interior to contract with water users for the delivery of Colorado River water and prohibited the delivery of water except by contract.

35.    Under this authority, the District and the United States entered a contract in 1932 for the delivery of water to the District, specifying the lands to which the District may deliver water.

36.    Additionally, pursuant to the Reclamation Act, Congress mandated that "[t]he right to the use of water acquired under the provisions of [the] Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372.  Further, Congress "forbade delivery of reclamation project water to any irrigable land held in private ownership by one owner in excess of 160 acres." *Bryant*, 447 U.S. at 360; *see* Omnibus Adjustment Act of 1926, 43 U.S.C. § 423e ("the 1926 Act").

37.    Congress further instructed that federal works under the Project Act were to be used, "[f]irst, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of [the] Colorado River compact; and third, for power." 43 U.S.C. § 617e.

38.    Of note, Article VIII of that 1922 Compact guaranteed that "Present perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact," Colo. River Compact, Art. VIII, thereby addressing "the concern of the farmers of Imperial Valley that … their existing water rights might be impaired by the Compact allocation." *Bryant*, 447 U.S. at 357 & n.4.  Rather, those water rights remained intact.

39.    The Supreme Court also addressed the scope of "present perfected water rights."  "In 1952 the State of Arizona invoked the original jurisdiction of [the Supreme] Court by filing a complaint against the State of California and seven of its public agencies," including the District.  *Arizona*, 373 U.S. at 550–51 & n.2 (footnote omitted).  The States of Nevada, New Mexico, and Utah, and the United States later became parties.  *Id*. at 551.

The dispute in the case concerned "how much water each State has a legal right to use out of the waters of the Colorado River and its tributaries." *Id*.

40.     A "primary aspect of the case was the recognition given to present perfected [water] rights," *Bryant*, 447 U.S. at 364, which the Supreme Court defined as "a water right acquired in accordance with state law [and existing as of June 25, 1929], which right has been exercised by the actual diversion of a specific quantity of water that has been applied to a defined area of land or to definite municipal or industrial works," *Arizona v. California*, 376 U.S. 340, 341 (1964).

41.     As the Supreme Court further explained in a 1979 supplemental decree, "present perfected rights" within the State of California included the following:

> The *Imperial Irrigation District* in annual quantities not to exceed (i) 2,600,000 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 424,145 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of 1901.

*Arizona v. California*, 439 U.S. 419, 420–21, 429 (1979).

**C.     The Bryant Litigation**

42.     As noted, during the *Bryant* litigation, the District stated that farmers like Mr. Abatti own water rights.

43.     The *Bryant* litigation began after the Department of the Interior attempted to enforce the 160-acre limit of the 1926 Act, 43 U.S.C. § 423e, on the Imperial Valley. *Bryant*, 447 U.S. at 360.

44.     For decades, the Secretary of the Interior had taken the position that this limit did not apply to Imperial Valley farmers who already had a perfected water right under Article VIII of the Colorado River Compact: "These lands, having already a water right, are entitled to have such vested right recognized without regard to the acreage limitation mentioned." *Bryant*, 447 U.S. at 362 (quoting 1933 letter of Secretary of the Interior, Ray Lyman Wilbur).

45.     In 1964, the Interior Department reversed that position and sued the District "for a declaratory judgment that the excess-acreage limitation of [the 1926 Act, 43 U.S.C. § 423e] applied to all private lands in the Valley." 447 U.S. at 365. Several landowners "intervene[d] as defendants representing the certified class of all landowners owning more than 160 acres." *Id*.

### i.     The District Court and Ninth Circuit Decisions in *Bryant*

46.     The district court ruled against the federal government, holding the 160-acre limitation inapplicable. *See United States v. Imperial Irrigation Dist.*, 322 F. Supp. 11 (S.D. Cal. 1971), *vacated and remanded*, 559 F.2d 509 (9th Cir. 1977), *rev'd in part and vacated in part sub nom. Bryant v. Yellen*, 447 U.S. 352 (1980). On appeal, the Ninth Circuit ruled against the District and the landowner class, rejecting the argument that Section 6 of the Project Act protected the "present perfected rights" of Valley farmers.

47.     The Ninth Circuit's ruling turned on its analysis of the water rights at stake. The court believed that "the perfected rights in Imperial Valley were owned by and would be adjudicated to the District, not to individual landowners, who were merely members of a class for whose benefit the water rights had been acquired and held in trust." *Bryant*, 447 U.S. at 369. The court concluded that "the users of water … do not possess rights to the water that can be considered private property in the ordinary sense of the words," and "[l]andowners within an irrigation district do not possess as part of their freehold estates a proportionate ownership in the water rights owned by the irrigation district." *United States v. Imperial Irrigation Dist.*, 559 F.2d 509, 529 (9th Cir. 1977), *rev'd in part and vacated in part sub nom. Bryant v. Yellen*, 447 U.S. 352 (1980).

48.     Because the District would continue to receive the same allotment of water regardless of whether individual landowners were required to reduce their holdings to 160 acres, the court concluded that perfected water rights would not be impaired by application of the limit to individual landowners. 559 F.2d at 529–30.

### ii.     The District's Petition for Certiorari and Briefs in *Bryant*

49.     Following the Ninth Circuit's decision, the District filed a petition for

9

certiorari in the Supreme Court, arguing that landowning farmers, and not the District itself, own the water rights in the Valley.

50. The District asserted that the Ninth Circuit misunderstood the nature of water rights "owned" by irrigation districts in California:

> Although it is true that the District holds the legal title to the water rights, it holds this title in trust for the landowners, who own the beneficial interest. It is the individual landowner—not the District—who puts the water to beneficial use.

Imperial Irrigation Dist. Pet. for Cert. at 16, *Bryant,* 447 U.S. 352 (*Imperial Irrigation Dist. v. Yellen*, No. 79-435) (IID Pet.).

51. As a result, the District argued, "the Project Act's mandate that present perfected rights be satisfied requires that in California such rights be satisfied with respect to individual landowners and their lands." *Id.* at 17. As the State of California put it in its brief in the *Bryant* litigation: the notion that the District held the present perfected water rights was "a dubious proposition, at best, since present perfected rights are tied to defined areas of land and presumably attach to that land irrespective of who owns it or whether it is held as excess acreage." Br. of Pet'r State of Cal., *Bryant,* 447 U.S. 352 (Consol. Nos. 79-421, 79-425, 79-435), 1980 WL 339517, at *11.

52. The District further argued that "[t]he notion that the District alone is protected against impairment of present perfected rights, and not the landowners who are the equitable owners of those rights under the laws of California, is also in collision with § 8 of the Reclamation Act of 1902." IID Pet. at 17; *see also id.* at 19 (arguing that the same notion "conflicts with both § 13 of the Project Act and § 8 of the Reclamation Act of 1902").

53. In its merits brief in the Supreme Court, the District again argued that the farmers, not the District, own the water rights:

> The Court of Appeals argues that the District, not the landowners, owns the decreed present perfected rights, and, therefore, the District can "redistribute" the water that is taken away from excess lands. This contention is quite untenable, both

factually and legally. … [A]s a matter of California law, the District is merely the trustee of water rights for the landowners, who are the beneficial owners, and their beneficial interest is a constitutionally protected property right which is appurtenant to the land irrigated. Section 6 [of the Project Act] directs that these rights be satisfied; there is no authority for taking them. As a matter of federal law, § 8 of the Reclamation Act of 1902 stipulates that rights to use of water supplied through federal works shall be appurtenant to the land irrigated, and § 13(d) of the Project Act prescribes that the "covenants" in § 13(c) (which subject all rights of the United States and water users to the Colorado River compact) shall "run with the land." This includes, by definition, the Compact term "present perfected rights," as adopted by the Project Act.

*Bryant* Pet'r Br. at 32–33, 1980 WL 672720, at *18–19.

54. The District further maintained that the court of appeals was "wrong" in concluding "that the Secretary could satisfy [Section] 6 by delivering all of the water subject to the District's present perfected rights to the District, and that the District could then withhold water from excess lands and redistribute it to non-excess lands." *Id.* at 50, 1980 WL 672720, at *31.

55. Rather, the District observed that "Section 6 of the Project Act, in requiring the 'satisfaction' of present perfected rights, and Article VIII of the Compact, in providing that present perfected rights are 'unimpaired,' expressly determine … priority." Reply Br. of Pet'r Imperial Irrigation Dist. at 17, *Bryant*, 447 U.S. 352 (No. 79-435), 1980 WL 672685, at *10.

### iii.    The Supreme Court's Decision in *Bryant*

56. At the District's urging, the Supreme Court rejected as "unpersuasive" the Ninth Circuit's ruling that, "because the perfected rights in Imperial Valley were owned by and would be adjudicated to the District, not to individual landowners," the Secretary could apply the acre limitation to those landowners. *Bryant*, 447 U.S. at 369.

57. The Court also rejected the Ninth Circuit's view that "[i]ndividual farmers … had no right under the law to a particular proportion of the District's water." *Id.*

58.    The Court further concluded that, "[w]hile the source of present perfected rights is to be found in state law, the question of whether rights provided by state law amount to present perfected rights within the meaning of § 6 is obviously one of federal law." *Id*. at 371 n.22.

59.    The Court held that, "as a matter of state law, not only did the District's water right entitle it to deliver water to the farms in the District regardless of size, but also *the right was equitably owned by the beneficiaries to whom the District was obligated to deliver water*." *Id.* at 371 (emphasis added).

60.    Because those water rights are protected by federal law, the District had no grounds to deny water to farmers possessing those rights unless federal law required it to do so.  As the Court explained, there was no suggestion that "the District, *absent some duty or disability imposed by federal law*, could have rightfully denied water to individual farmers owning more than 160 acres." *Id*. (emphasis added).  "The District is obligated not only to continue delivery, but also to apportion water distributed for irrigation purposes ratably to each landowner in accordance with his share of the total assessments in the District." *Id.* at 371 n.23.

61.    One reason the Court gave for declining to apply an acreage limitation was that such a restriction would have the effect of "substantially limiting … *the rights of … the farmer-beneficiaries in the District*." *Id*. at 373 (emphasis added).

62.    The Court confirmed in an accompanying footnote that "the congressional intention" in passing laws governing the Boulder Canyon Project "was to insure that *persons actually applying water to beneficial use* would not have their uses disturbed by the erection of the dam." *Id.* at 373 n.24 (quoting Special Master Report at 309, *Arizona v. California*, 373 U.S. 546 (1963)) (emphasis added); *see also* Special Master Report at 309 (finding "a congressional intention to protect, as present perfected rights, those uses which were actually in existence [as of the Project Act's effective date, June 25, 1929] and which were the basis of a going economy").

### D. The District's 2013 EDP

63.     After the Supreme Court's decision in *Bryant*, the District continued to manage Colorado River water and distribute water to Imperial Valley farmers, without any set plan, for decades.   Then, in October 2013, the District adopted what it called an "Equitable Distribution Plan."

64.     The 2013 EDP was a permanent water allocation scheme.  That EDP nullified the water rights of Mr. Abatti and other Imperial Valley farmers, provided for the transfer of their rights to other users without compensation, and established a water priority scheme under which agricultural users received no priority at all.  The EDP declared that, in the event of a water shortage, water would be allocated in this order of priority: (1) Municipal Users; (2) Industrial Users; (3) Feed Lots, Dairies and Fish Farms; (4) Environmental Resources Water; and, lastly, (5) Agricultural Lands.  Moreover, all non-agricultural water users were entitled to water based on their past usage, while farmers received no such guarantee.  Mr. Abatti stood to lose as much as 50% of the water required for some of his farmland.

65.     Mr. Abatti and Mike Abatti Farms challenged the EDP in the Superior Court for Imperial County, claiming that it violated state law.  The Superior Court agreed, holding that the 2013 EDP violated state law.  Stmt. of Decision, *Abatti v. Imperial Irrigation Dist.*, Case No. ECU07980 (Super. Ct. Aug. 15, 2017).  The Court found that the 2013 EDP prioritized other groups of water users over farmers.  *Id*. at 5.  It also found that "the 2013 EDP is not equitable because it disadvantages farmers, who should not be treated differently and with a lesser priority than other, non-domestic, classes of water users, such that Respondent District abused its discretion in adopting it."  *Id*. at 6.  Following this decision, the District repealed the 2013 EDP in February 2018.

66.     However, the District also appealed the Superior Court's ruling to the California Court of Appeal.  The Court of Appeal affirmed in part and reversed in part. *Abatti v. Imperial Irrigation Dist*., 52 Cal. App. 5th 236 (2020), *cert denied,* 141 S. Ct. 2856 (2021).  While rejecting some of the state law claims before it, the Court of Appeal

held that "the District did err in the manner in which it prioritizes users." *Id*. at 266. The Court of Appeal also affirmed that "[t]he farmers are beneficial owners of the District's water rights[.]" *Id*. at 263. And thus, the Court explained, "[i]t was not reasonable for the District to adopt a permanent, annual apportionment that applies few, if any, limits on most categories of users and effectively places the burden of shortages almost entirely on farmers." *Id*. at 275. It therefore affirmed the Superior Court's ruling that the District erred "in how it prioritizes apportionment among categories of water users in the 2013 EDP." *Id*. at 309.

### E.     The District's 2022 EDP

67.     In 2022, the District again adopted an EDP. At a public meeting held on June 21, 2022, the District's Board of Directors adopted the 2022 EDP by a 4-1 vote.

68.     Before the meeting, Plaintiffs submitted public comments urging the Board to reject the EDP. The Board's president read the comments into the record, but the Board did not otherwise discuss Plaintiffs' comments.

69.     Board member Javier Gonzalez voted against the 2022 EDP. In remarks made just before he cast his vote, Mr. Gonzalez stated that "what they're asking is not conservation; it's you have to stop farming."

70.     The 2022 EDP divides water users into three categories: (1) Industrial/Commercial Water Users, (2) Potable Water Users, and (3) Agricultural Water Users.

71.     The 2022 EDP defines an Industrial/Commercial Water User as a user of water that receives water directly from the District "for industrial and commercial uses." EDP § 2.19.

72.     The EDP defines a Potable Water User as a user of water that receives water from the District and "treat[s] that water through a water treatment system to deliver potable water to its water users, including but not limited to municipalities and special districts." EDP § 2.24.

73.     The EDP defines an Agricultural Water User as a user of water supplied by the District "for irrigation, related to agricultural purposes, duck ponds, and algae farming." EDP § 2.1.  Agricultural Water Users under the EDP consist mainly of farmers such as Mr. Abatti who use water to irrigate their croplands.

74.     The District's old, 2013 EDP had divided water users into five categories—(1) "Municipal Users," (2) "Industrial Users," (3) "Feed Lots, Dairies and Fish Farms," (4) users of "Environmental Resources Water," and (5) "Agricultural Lands."  In the 2022 EDP, the category of "Industrial/Commercial Water Users" appears to encompass the second and third categories of the 2013 EDP.  The 2013 EDP's "Municipal Users" category appears to correspond to the 2022 EDP's "Potable Water Users" category.

75.     The 2022 EDP sets forth a "default Method of Apportionment" of water for each category of water user.  However, as these are only "default" apportionment methods, the District may use different apportionment methods.

76.     The EDP apportions water to Agricultural Water Users—i.e., farmers who use the water to irrigate their croplands—differently than it does to the other categories of water users.

77.     For instance, *non-farmers* receive the average amount of water they used in the last three years.  The EDP refers to this as the "Three-Year Average Apportionment Method."  *See* EDP §§ 3.3-3.4.

78.     *Farmers*, by contrast, receive only *half* of the average amount of water they used between *one and two decades ago*, which amount is subject to a 10 acre-feet "maximum" or cap, plus an additional amount of water to be calculated on a "straight line" basis.

79.     The EDP refers to this as a "Hybrid Apportionment," which is "comprised of a historical use component and a straight line component."

80.     Section 3.2 of the EDP apportions to Agricultural Water Users the sum of:

    a. One-half of the average amount of water used each Calendar Year between 2003 to 2012, excluding the highest and lowest Calendar Years,

up to a maximum of 10 acre-feet (i.e., 5 acre-feet will be maximum 1/2 of 10 acre-feet limit); and

b. After the historical use component is calculated for every Eligible Agricultural Acre within the Agricultural Water User Category and that amount is subtracted from the Category Apportionment, the remaining amount of Category Apportionment for the Agricultural Water User Category is divided by the Eligible Agricultural Acres resulting in a flat amount for each Eligible Agricultural Acre.

81. Additionally, Section 3.2 of the EDP states that the default method of apportionment for Agricultural Water Users "may be changed" for any calendar year "at the discretion of the IID Board of Directors."

82. Section 8.3 of the EDP provides that "In the event of a Water Management Reduction, the IID Board of Directors, at its sole discretion, may take any actions it determines and finds are necessary to protect the public health and safety."

83. The EDP defines a Water Management Reduction as "A reduction in Available Water Supply for Apportionment, or a percentage reduction in each Category Apportionment, because of a District-wide overrun payback requirement mandatory program, or regulatory limitation of or reduction in the District's Colorado River water supply." EDP § 2.29.

84. Section 8.4 of the EDP provides that the District's Board of Directors may "terminate the implementation of an annual Apportionment" of water "at any time at its discretion." The Board may exercise this unfettered discretion upon the recommendation of the Agricultural Water Advisory Committee, but such a recommendation is not required.

85. Because the Board may terminate the implementation of an annual apportionment "at any time at its discretion," the EDP does not require the Board to give water users pre-termination notice or a pre-termination opportunity to be heard.

86. In its allocation of water, the 2022 EDP fails to take into account the water rights acquired under federal law, including Section 8 of the Reclamation Act, by Mr. Abatti and other farmers based on their beneficial use of Colorado River water to irrigate farmland in the District.

87.     In its allocation of water, the 2022 EDP fails to take into account the present perfected rights obtained based on the beneficial use of Colorado River water to irrigate 424,125 acres of land within the District and recognized in the Supreme Court's 1979 decree in *Arizona*.

**F.     False Premises and Assumptions of the 2022 EDP**

88.     The 2022 EDP starts from a number of false premises and assumptions and operates based on those false premises and assumptions.

89.     At the outset, the 2022 EDP assumes incorrectly that no farmer in the District's jurisdiction has any water rights.  Instead, the EDP assumes that farmers receive water service from the District, and only that.  The EDP treats all farmers as if they were merely users of water in a municipal water supply district.

90.     The 2022 EDP also assumes that farmers' rights are not appurtenant to the land.  The EDP assumes that farmers do not have any rights based on, measured by, or limited to their beneficial use of Colorado River water.

91.     Further, the 2022 EDP says nothing about present perfected rights and ignores those rights altogether.  Because the EDP is silent with respect to present perfected rights, it gives no priority to such rights.

92.     The 2022 EDP also says nothing about the 424,145 acres to which present perfected rights attach under the Supreme Court's 1979 decree in *Arizona v. California*, and the EDP operates without regard to such acres.

93.     Finally, the 2022 EDP assumes that the District has unfettered discretion to allocate water to users within the District's jurisdiction as it sees fit and may change that allocate at any time at its discretion.

**G.     Impact of the 2022 EDP on Plaintiffs**

94.     Plaintiffs are Agricultural Water Users under the 2022 EDP.

95.     The 2022 EDP fails to guarantee or allocate to Plaintiffs the water sufficient to meet their irrigation needs, based on their historical beneficial use of water.  Instead, the EDP allocates to Plaintiffs only *half* of their average historical use of water plus an

additional amount based on a straight-line calculation. The straight-line amount is far less than half of their average historical use.

96. The 2022 EDP will have a severe economic impact on Plaintiffs. Mr. Abatti and his family have long owned and operated thriving farming businesses in the Imperial Valley. Mike Abatti Farms, LLC is such a business. Because of the EDP, Plaintiffs will lose a significant percentage of the water they have historically used to irrigate their farmland, which in turn will have serious adverse effects upon their crops and the economic success of their farming business.

97. Under the 2022 EDP, the District will cut the amount of irrigation water that it delivers to Plaintiffs, for 2022, by approximately 8.5%, a significant amount.

98. Historically, Plaintiffs' farmland has required an average of approximately 7.05 acre feet of water per acre per year for irrigation. Some of Plaintiffs' acreage requires up to 9 acre feet of water per year due to its sandy conditions. Under the 2022 EDP, however, Plaintiffs will receive only about 6.45 acre feet of water per acre per year.

99. An 8.5% cut in water delivered to Plaintiffs for irrigation will cause their crop yields to be reduced by as much as 17%.

100. The total value of Plaintiffs' 2022 crops exceeds $15,000,000. The 2022 EDP will reduce the value of their 2022 crops by several million dollars. The EDP will have much the same effect every year that Plaintiffs remain in the farming business.

101. The 2022 EDP will also render useless some of the farm equipment for which Plaintiffs took on debt.

102. As a result of the 2022 EDP, some of the land Plaintiffs own and farm will return to its natural state—a desert—due to insufficient irrigation. That will strip those portions of property of any beneficial use.

103. Based on the 2022 allocation of water, the 2022 EDP will render valueless approximately 8.5% of Plaintiffs' farmland, causing a loss of more than $4 million in property value.

104.   Moreover, these harms will only grow if the District exercises its unfettered discretion to further reduce the water supply available to Agriculture Water Users like Mr. Abatti.

## V.   DECLARATORY JUDGMENT ALLEGATIONS

105.   The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

106.   The facts and circumstances between Plaintiffs and Defendants are such that there is a substantial controversy between them of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

107.   The declaratory judgment requested by Plaintiffs will serve a useful purpose in clarifying and settling the legal relations between the parties, and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this case.

108.   Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

## VI.   PLAINTIFFS' CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF

### VIOLATION OF FEDERAL LAWS GOVERNING USE OF COLORADO RIVER WATER, INCLUDING THE RECLAMATION ACT, BOULDER CANYON PROJECT ACT, COLORADO RIVER COMPACT, AND SUPREME COURT DECREES

109.   Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

110.   As the District previously recognized, Plaintiffs are the owners of water rights derived from a body of federal law settling rights to the use of the waters of the Colorado River.  That body of law includes the Reclamation Act of 1902, the Colorado River

Compact of 1922, the Boulder Canyon Project Act of 1929, and the decrees entered by the Supreme Court in *Arizona v. California*.

111.   Section 8 of the Reclamation Act provides in part: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."  43 U.S.C. § 372.

112.   Article VIII of the Colorado River Compact provides in part: "Present perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact."  Colorado River Compact, 1922, Art. VIII.

113.   Section 6 of the Project Act, which took effect in 1929, provides in part: "The dam and reservoir provided for by section [1] of this title shall be used: First, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact; and third, for power."  43 U.S.C. § 617e.

114.   Section 13(c) of the Project Act provides in part that: "[A]ll ... grants, contracts, … or other privileges from the United States or under its authority, necessary or convenient for the use of waters of the Colorado River" shall "be subject to and controlled by said Colorado River compact."  43 U.S.C. § 617*l*(c).

115.   Section 13(d) of the Project Act provides in part: "The conditions and covenants referred to herein shall be deemed to run with the land and the right, interest, or privilege therein and water right, and shall attach as a matter of law, … and shall be deemed to be for the benefit of and be available to … the users of water therein or thereunder[.]"  43 U.S.C. § 617*l*(d).

116.   In the Supreme Court's supplemental decree of January 9, 1979, in *Arizona v. California*, the Court decreed that the "present perfected rights" within the state of California included the following: "*The Imperial Irrigation District* in annual quantities [of water] not to exceed (i) 2,600,000 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for

irrigation of 424,145 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of 1901." 439 U.S. at 420–21, 429.

117. As noted, under Section 8 of the Reclamation Act, Plaintiffs possess and own water rights derived from and protected by federal law and measured by their historical beneficial use of the waters of the Colorado River. Under Section 8, Plaintiffs' federal water rights are appurtenant to the land that they irrigate and farm.

118. In several cases, the U.S. Supreme Court has held that, under Section 8 of the Reclamation Act, water rights are owned, not by the federal government by virtue of its involvement in a reclamation project, but by the landowner who actually puts the water to beneficial use. *See Nevada v. United States*, 463 U.S. 110 (1983); *Nebraska v. Wyoming*, 325 U.S. 589 (1945); *Ickes v. Fox*, 300 U.S. 82 (1937).

119. In *Truckee-Carson Irrigation District v. Secretary of Department of Interior*, 742 F.2d 527 (9th Cir. 1984), the U.S. Court of Appeals for the Ninth Circuit held that rights to the water at issue in that case were owned, not by the Truckee-Carson Irrigation District ("TCID"), but by the landowners who put the water to beneficial use. The Court stated: "As a water district responsible for managing a reclamation project, TCID does not directly own any water rights. Rather, the landowners within the service area irrigated by the Newlands Project own water rights." *Id*. at 530.

120. In 1997, Solicitors of the U.S. Department of the Interior prepared a memorandum similarly rejecting the notion that rights to certain project waters were likely "held by the irrigation districts." Memo. from David Nawi & Lynn Peterson, Reg'l Solics., U.S. Dep't of the Interior, to Reg'l Dir., U.S. Bureau of Reclamation, Mid-Pacific Region, Sacramento, Cal., et al. 10 (Jan. 9, 1997).

121. The solicitors concluded: "Unlike the United States and individual water users, in the typical case irrigation districts hold neither a legal nor beneficial interest in the water right. They have no property interest in the water, nor have they in their own right diverted the water to storage. Moreover, the districts have not put the water to beneficial use and thus do not hold an interest in the water right." *Id*. (citation omitted).

122. The District's 2022 EDP violates each of these provisions, as the EDP's water allocation scheme operates on the assumption that farmers in the Imperial Valley, including Plaintiffs, have no water rights at all.

123. The 2022 EDP violates the body of federal law recognizing and protecting the right of landowners in the Imperial Valley, including Plaintiffs, to use water for irrigation based on "present perfected rights." Article VIII of the Colorado River Compact preserved "present perfected rights" to the waters of the Colorado River. Section 6 of the Project Act required Colorado River water to be used "for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact." And in its 1979 *Arizona* decree, the Supreme Court decreed that, within the Imperial Irrigation District are present perfected rights to use 2.6 million acre-feet of Colorado River water annually to irrigate 424,125 acres of land in the District.

124. Lands that Plaintiffs own, irrigate, and farm lie within that 424,125 acres. The 2022 EDP's water allocation scheme does not recognize or take into account present perfected rights. The EDP allocates water to users in the District without regard to, and without giving any priority to, the present perfected rights to use 2.6 million acre-feet of water to irrigate 424,125 acres of land. The EDP violates Plaintiffs' water rights under the Colorado River Compact, the Project Act, and the 1979 *Arizona* decree.

125. As state actors, Defendants may not deny or abridge Plaintiffs' federal water rights. State law gives Defendants no lawful authority to do so.

**SECOND CLAIM FOR RELIEF**

**UNLAWFUL TAKING OF PROPERTY**

126. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

127. The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to state government actors through the Due Process Clause of the Fourteenth Amendment.

128. Plaintiffs own and have ownership interests in real property in Imperial Valley that they use as farmland. These are constitutionally protected property interests.

129. Plaintiffs possess and own water rights under federal law to make beneficial use of the Colorado River water. These are constitutionally protected property interests.

130. The Reclamation Act provides: "The right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 43 U.S.C. § 372.

131. Plaintiffs possess federal water rights under the Reclamation Act. Their water rights are appurtenant to the farmland that they own and irrigate. And their beneficial use of Colorado River water provides the measure as well as the basis of their water rights.

132. The District's 2022 EDP effects an unlawful taking of Plaintiffs' property and property interests, including their water rights and interests in real property. The EDP takes property from Plaintiffs for a public purpose without just compensation. The EDP is unconstitutional under the Takings Clause.

133. Under the Takings Clause, the government may not take the property of person *A* and give it to person *B*. In violation of this understanding of the Takings Clause, the 2022 EDP takes the water Plaintiffs have a right to use and transfers it to other users who do not have a right to use it.

134. The 2022 EDP will have a severe economic impact on Plaintiffs. Plaintiff Michael Abatti and his family have long owned and operated thriving farming businesses in the Imperial Valley. Plaintiff Mike Abatti Farms, LLC is such a business. Because of the EDP, Plaintiffs will lose a significant percentage of the water they have historically used to irrigate their farmland, which in turn will have serious adverse effects upon their crops and the economic success of their farming business.

135. Due to the EDP, some of the parcels farmed by Plaintiffs will return to their natural state—desert—due to the lack of sufficient irrigation water. This will deprive Plaintiffs of all economically beneficial use of that property.

136. Like his ancestors, Mr. Abatti has made his farming business in the Imperial Valley his life's work. For more than 40 years, he has invested significant time, money, and resources in his farmland and his farming business, which depend upon water from the District for irrigation. He made those investments with the reasonable expectation that the District would continue to abide by the federal-law requirement that the District allocate to him water sufficient to meet his irrigation needs, based on his historical beneficial use of water.

137. The nature or character of the District's action also points to a Takings Clause violation. The District serves as a trustee of the water rights owned by farmers in the Imperial Valley. The 2022 EDP and the District's taking of Plaintiffs' water rights are inconsistent with the District's duties as a trustee. Accordingly, through the 2022 EDP, Defendants have unlawfully taken Plaintiffs' property.

## THIRD CLAIM FOR RELIEF

### DEPRIVATION OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS

138. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

139. The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3.

140. The Due Process Clause includes both a procedural and substantive component.

141. The procedural component requires the government to provide timely notice and an opportunity to be heard before depriving a person of liberty or property interests.

142. The substantive component forbids the government from depriving persons of liberty or property interests that are deeply rooted in history and tradition.

143. The Due Process Clause applies to and restrains the District, which is a state actor, and the Individual Defendants, who are the District's board members.

144.    The 2022 EDP deprives Plaintiffs of liberty and property interests without due process, in violation of the procedural and substantive components of the Due Process Clause.

145.    Plaintiffs' water rights, including the right to make beneficial use of Colorado River water, are recognized under federal law and are property rights protected by the Due Process Clause.

146.    The land in Imperial Valley that Plaintiffs own, irrigate, and farm is property protected by the Due Process Clause.

147.    Mr. Abatti's right to irrigate his farmland, and his ability to access and use water sufficient for the irrigation needs of his land, are liberty and property interests protected by the Due Process Clause.

148.    Mr. Abatti's right to farm his lands and earn a livelihood from farming, as well as his right to operate a farming business, are liberty and property interests protected by the Due Process Clause.

149.    The right of a landowner to devote his property to legitimate use is a property interest protected by the Due Process Clause.

150.    The 2022 EDP vests the members of the District's Board of Directors with discretion to "terminate" the annual apportionment of water to Plaintiffs, or to reduce the amount of water that the District delivers to Plaintiffs, "at any time."

151.    The 2022 EDP does not provide affected water uses any pre-deprivation notice or opportunity to be heard before the Board may exercise its discretion to terminate or reduce water at any time.

152.    State action that vests government officials with unfettered discretion to deprive a person of liberty or property interests violates the right to due process.

153.    The 2022 EDP violates procedural due process because it does not guarantee water users such as Plaintiffs notice and opportunity to be heard when the Board exercises its discretion to terminate the annual apportionment of water or reduce the amount of water it delivers to water users.

154. The 2022 EDP violates procedural due process because it vests the District's Board with unlimited discretion to terminate the annual appropriation of water to users, or to reduce the amount of water delivered to water users, at any time.

155. The 2022 EDP violates substantive due process because it deprives Mr. Abatti of deeply rooted liberty and property rights possessed and exercised by Mr. Abatti and his forebearers for more than a century. Mr. Abatti's right to irrigate his farmland in Imperial Valley with Colorado River water is a federal water right confirmed by the Reclamation Act of 1902 and also a "present perfected right" under the Colorado River Compact of 1922, the Project Act of 1929, and the Supreme Court's supplemental *Arizona* decree.

156. The 2022 EDP violates substantive due process because, in its allocation of water, it disfavors farmers such as Mr. Abatti compared to all other categories of water users, including industrial and commercial water users, and because this disfavored treatment of Mr. Abatti and other farmers is clearly arbitrary and unreasonable and has no substantial relationship to any legitimate objective of an Imperial Valley irrigation district.

## FOURTH CLAIM FOR RELIEF
### DENIAL OF EQUAL PROTECTION

157. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

158. The Equal Protection Clause of the Fourteenth Amendment provides: "[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4.

159. The Equal Protection Clause applies to and restrains the District, which is a state actor, and the Individual Defendants, who are the District's board members.

160. The 2022 EDP denies Plaintiffs the right to equal protection in violation of the Fourteenth Amendment.

161. The 2022 EDP discriminates against farmers, like Mr. Abatti, who use water the District supplies to irrigate their farmland.

162.   The 2022 EDP singles out farmers such as Mr. Abatti for substantially less favorable treatment than each other category of water user, including industrial and commercial water users.

163.   The 2022 EDP, in its apportionment of water to different categories of water users, fails to recognize or consider that water users such as Plaintiffs have water rights and present perfected rights under federal law.

164.   The 2022 EDP allocates water to Industrial/Commercial Water Users based on a calculation of their average recent water use.

165.   But the 2022 EDP allocates to Agricultural Water Users, like Plaintiffs, only half of their average historical water use.

166.   The EDP also allocates water to Agricultural Users based on a straight-line calculation, but that allocation is far less than one based on historical use.

167.   The 2022 EDP's disparate and disfavored treatment of Agricultural Water Users, including Mr. Abatti, compared to Industrial/Commercial Water Users in the apportionment of water is arbitrary and irrational.

168.   The 2022 EDP is arbitrary and irrational because, in its apportionment of water between categories of water users, the EDP fails to account for whether a water user has water rights or present perfected rights under the federal law.  Mr. Abatti has federal water rights and is also entitled to water based on present perfected rights recognized under federal law.  Accordingly, the 2022 EDP also violates the Equal Protection Clause.

## FIFTH CLAIM FOR RELIEF
### JUDICIAL ESTOPPEL AND COLLATERAL ESTOPPEL

169.   Plaintiffs incorporate all other allegations as if set forth fully herein.

170.   Article III of the Constitution provides: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.

171.   The District is bound by its representations to the U.S. Supreme Court in

27

*Bryant* under the doctrine of judicial estoppel, and is bound by the Supreme Court's decision in *Bryant* under the doctrine of collateral estoppel or issue preclusion.

172.    First, judicial estoppel forecloses any attempt to enforce the 2022 EDP.  Under the equitable doctrine of judicial estoppel, federal courts have inherent judicial power to estop a party from asserting in a proceeding a position that is inconsistent with the position maintained by that same party in a prior proceeding.

173.    In *Bryant*, the District made binding representations in its submissions to the Supreme Court that farmers like Plaintiffs possess water rights under federal law.

174.    Defendants may not now argue the opposite, suggesting that landowners in the Imperial Valley are not the beneficial owners of water rights that the District holds in trust for them, or that the landowners' beneficial interest is not a constitutionally protected property right appurtenant to the irrigated land.

175.    Indeed, the District expressly represented the opposite to the Supreme Court: "the District is merely the trustee of water rights for landowners, who are the beneficial owners, and their beneficial interest is a constitutionally protected property right which is appurtenant to the land irrigated." *Bryant* Pet'r Br. at 33.

176.    These representations now bind Defendants under the doctrine of judicial estoppel.  And, because the representations were made to a federal court, indeed, to the U.S. Supreme Court, the federal judiciary must decide for itself the binding effect of the District's representations in *Bryant*.

177.    Second, collateral estoppel precludes the District from making arguments here that contradict the positions it took in the *Bryant* litigation.

178.    In *Bryant*, the Supreme Court held that, as a matter of federal law, the rights to the water delivered by the District to farmers in Imperial Valley are "equitably owned by the beneficiaries to whom the District was obligated to deliver water."  447 U.S. at 371.

179.    Under the doctrine of collateral estoppel or issue preclusion, a prior judgment forecloses successive litigation of an issue of fact or law actually litigated and resolved in

a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim.

180. The District was a party in the *Bryant* litigation and thus is bound by the Court's judgment in that case.

181. Under the Supremacy Clause, the Court's decision in *Bryant* is "the supreme Law of the Land; and the Judges in every State shall be bound thereby." U.S. Const. art. VI, cl. 2. Thus, the courts of California are bound by *Bryant*.

182. Under *Bryant*, the 2022 EDP is unlawful because the EDP operates on the assumption that Plaintiffs own no water rights.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 1983

183. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

184. 42 U.S.C. § 1983, known as Section 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

185. In violation of Section 1983, Defendants, acting under color of state law, have injured Plaintiffs, and deprived them of their rights under the Constitution and laws of the United States, as alleged in this Complaint.

186. Under Section 1983, Defendants are liable to Plaintiffs for appropriate relief, including declaratory and injunctive relief.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court grant the following relief:

A.    A declaratory judgment under 28 U.S.C. § 2201 that Plaintiffs possess and own water rights under federal law based on and measured by their historical beneficial use of Colorado River water to irrigate farmland and that these federal water rights are not owned by the District;

B.    A declaratory judgment under 28 U.S.C. § 2201 that Plaintiffs are entitled to their *pro rata* share of the present perfected rights to 2.6 million acre-feet of water annually for irrigation of 424,125 acres of land in the Imperial Irrigation District;

C.    A declaratory judgment under 28 U.S.C. § 2201 that Defendants' 2022 EDP is inconsistent with and violates Plaintiffs' water rights and present perfected rights under federal law;

D.    A declaratory judgment under 28 U.S.C. § 2201 that Defendants' 2022 EDP violates the Fifth and Fourteenth Amendments of the U.S. Constitution;

E.    An injunction prohibiting Defendants from enforcing or carrying out the 2022 EDP;

F.    An alternative injunction prohibiting Defendants from enforcing or carrying out the 2022 EDP as to Plaintiffs;

G.    Just compensation for Defendants' taking of Plaintiffs' property;

H.    Nominal damages based on Defendants' violation of Plaintiffs' constitutional and other rights under federal law;

I.    An award of attorneys' fees and costs under 42 U.S.C. § 1988; and

J.    Any other relief that the Court deems just and proper.

By: */s/ Donald M. Falk*
    Donald M. Falk
     Cal. Bar No. 150256
    SCHAERR | JAFFE LLP
    Four Embarcadero Center
    Suite 1400
    San Francisco, CA 94111
    (415) 562-4942
    dfalk@schaerr-jaffe.com

    H. Christopher Bartolomucci*
     D.C. Bar No. 452423
    Brian J. Field*
     D.C. Bar No. 985577
    SCHAERR | JAFFE LLP
    1717 K Street NW, Suite 900
    Washington, DC 20006
    (202) 787-1060
    cbartolomucci@schaerr-jaffe.com
    bfield@schaerr-jaffe.com

    *Application for admission
    *pro hac vice* forthcoming

    *Counsel for Plaintiffs*

Dated: September 2, 2022